1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

9
10
11
12
13
14

THE ESTATE OF ANGEL LOPEZ by
and through its successor in interest,
LYDIA LOPEZ; LYDIA LOPEZ;
ANGEL LOPEZ, JR. and HECTOR
LOPEZ, by and through their guardian
*ad litem*, LYDIA LOPEZ,

                                        Plaintiffs,

     v.

CITY OF SAN DIEGO;
KRISTOPHER MICHAEL WALB
AND DOES 2-30,

                                        Defendants.

CASE NO. 13cv2240-GPC-MDD

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

[Dkt. No. 48.]

15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.  INTRODUCTION

Presently before the Court is a Motion for Summary Judgment filed by Defendants City of San Diego and Kristopher Walb ("Defendants").  (Dkt. No. 48.) The Parties have fully briefed the motion.  (Dkt. Nos. 50, 52.)  Pursuant to Civil Local Rule 7.1(d)(1), the Court finds the matter suitable for adjudication without oral argument.  For the following reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment.

## II.  FACTUAL BACKGROUND

This case arises from the shooting death of Angel Lopez ("Lopez") by San Diego Police Officer Kristopher Walb on January 17, 2013.  Except where noted, the

following factual background is undisputed.[1]

At the time of the subject incident, Lopez was on parole after serving a sentence for felon in possession of a firearm. (Dkt. No. 48-3, Torres-Skerett Decl. ¶¶ 5-6.) Following violations of his parole, a warrant was issued for Lopez's arrest and listed Lopez as armed and dangerous. (*Id.* ¶¶ 7-8, 15.)

On the morning of January 17, 2013, Parole Agent Lou Torres ("Agent Torres"), who was Lopez's case agent, received a call from a person named Alec who inquired if Agent Torres was the parole agent for Angel Lopez aka Necio. (*Id.* ¶¶ 10, 16.) The caller stated that Lopez and his father, Alex Lopez, were at 5444 Reservoir Drive, Apartment #58. (*Id.* ¶ 17.) The caller was aware that the father was also a parolee at large, was a member of the "Sherman" gang, and went by the name Conejo (Rabbit). (*Id.*) Agent Torres was able to confirm the information with respect to the father. (*Id.* ¶ 18.) In addition, the caller stated that Angel Lopez was left handed and would be carrying a .25 caliber pistol in his left pocket. (*Id.* ¶ 19.) The caller indicated that the father had a sawed-off shotgun and an AK-47 at Apartment #58. (*Id.* ¶ 20.) The caller identified two vehicles to look for, one a rented Ford Focus and the other a 1999 Ford Explorer, license number 4HCL80, a known vehicle driven by Angel Lopez's wife, Lydia Lopez. (*Id.* ¶ 21.) Agent Torres and the caller Alec then exchanged phone numbers. (*Id.* ¶ 22.)

Agent Torres met with Captain Andrew Mills ("Captain Mills") of the Eastern Division San Diego Police Department ("SDPD") and passed on the information given to him by the caller Alec. (*Id.* ¶ 23.) Based on that information, Captain Mills directed various SDPD personnel to confirm the caller's information and collect background on Angel Lopez.

One of the assigned officers was Sgt. Steve Riddle ("Sgt. Riddle"), who was a gang detective who specialized in Hispanic gangs. (Dkt. No. 48-4, Riddle Decl. ¶ 3.)

---

[1]To the extent that the Court relied upon evidence to which the parties objected, the objections are overruled. To the extent the Court did not rely on evidence to which the parties objected, the objections are overruled as moot.

Angel Lopez was a member of one of the targeted gangs, Sidro, and therefore Sgt. Riddle was familiar with Lopez and his past gang activities. (*Id.* ¶¶ 4-9.) Sgt. Riddle met with Captain Mills, Agent Torres, and others, and provided information about Lopez, his father, and the Sidro gang. (*Id.* ¶¶ 10-30.) For example, Sgt. Riddle informed them that Lopez had a history of gun violence, must be considered to be armed, was unpredictable, and had a number of gang tattoos, including on his neck. (*Id.* ¶¶ 14, 20, 22, 24.)

Two undercover officers, acting Detective Paul Tom and Detective Brad Elow ("Detective Elow"), were sent to 5444 Reservoir Drive and located in the parking lot a burgundy four-door hatchback Ford Focus, license number 5UNK285 CA. (Dkt. No. 48-5, Elow Decl. ¶ 7.) A patrol officer, at Detective Elow's direction, ran the plate and determined that it was registered to a rental car company. (*Id.* ¶ 9.)

At approximately 10:33 a.m., January 17, 2013, Detective Tim Williams contacted the rental car company. (Dkt. No. 48-6, Williams Decl. ¶ 6.) The rental agreement indicated that the burgundy Ford Focus was rented on January 10, 2013, to Xavier Lenyoun. (*Id.* ¶ 7.) Xavier Lenyoun also rented Apartment #58 at 5444 Reservoir Drive. (*Id.* ¶ 8.)

Detective Dean Way obtained a photo of Angel Lopez, and confirmed its authenticity with Agent Torres. (Dkt. No. 48-7, Way Decl. ¶ 5.) The photo was then distributed to members of the SDPD involved in the operation. (*Id.* ¶ 6.)

A Special Response Team ("SRT") unit, and two Primary Response Team ("PRT") units, undercover officers and uniformed officers were deployed to the Reservoir Drive area. (Dkt. No. 48-9, Ramsay Decl. ¶¶ 3-4.) SRT Sgt. Mike Ramsay informed the SRT Unit, which included Officers Kristopher Walb ("Officer Walb"), Brad Pickett ("Officer Pickett"), and Jason Scott ("Officer Scott"), "all the information he had been provided, which included background from Eastern Division, as well as radio transmissions." (*Id.* ¶ 5.)

SRT was deployed in an unmarked van on the eastside parking lot of the target

apartment on Reservoir Drive.  (*Id.* ¶ 6.)  The PRT officers were in marked SDPD vehicles deployed in the immediate area.  (*Id.* ¶ 7.)  The initial plan called for PRT officers to conduct a vehicle hot stop of Angel Lopez and his father if they were in a vehicle.  (*Id.* ¶ 8.)  SRT was to deploy to the target apartment, 5444 Reservoir Drive, #D58, lock the exterior of the apartment down and conduct containment and call out if there were subjects in the apartment.  (*Id.* ¶ 9.)  Undercover officers were acting as the "eyes," attempting to spot the suspect.  (*Id.* ¶ 10.)

Uniformed Officers Nicholas Ketchum ("Officer Ketchum") and Christopher Luth ("Officer Luth") received information via radio that two Hispanic males walked out of the apartment complex towards the burgundy Ford Focus. (Dkt. No. 48-10, Luth Decl. ¶¶ 3, 8.)  The officers drove over to the Ford in a marked vehicle.  (*Id.* ¶ 8.) Officers Ketchum and Luth exited the vehicle with their weapons aimed at the suspects and ordered them to the ground.  (*Id.* ¶ 9.)  Officer Luth shouted "Stop!  Get on the ground!" several times.  (*Id.*)  Both suspects turned around and ran back toward the apartment complex.  (*Id.*)

The SRT officers responded to a radio report that the suspects had fled on foot. (Dkt. No. 48-11, Walb Decl. ¶ 14.)  Officers Walb, Pickett, and Scott entered the apartment complex through the west entrance with the thought of reaching Apartment #58 on the third floor.  (*Id.* ¶ 15.)  As Officer Walb approached the third floor landing, he could hear someone running in the third floor hallway.  (*Id.* ¶ 16.)  Officer Walb waited a few seconds anticipating the person to come through the door at the stairwell. (*Id.* ¶ 17.)  Within seconds, the door flew open as a Hispanic male matching Lopez's description opened the door.  (*Id.* ¶ 18.)  The individual appeared to match the weight, height, and age of Lopez, and the tattoos on his neck were consistent with what Officer Walb had seen on the photo of Lopez.  (*Id.* ¶ 19; Dkt. 50-11, Walb Dep. 128:8-22.[2]) Officer Walb issued commands in a loud, clear voice: "Police," "Don't move."  (Walb

---

[2]Deposition page number citations such as this one are to the page numbers reflected on the reporter's transcript and not to the page numbers assigned by the Court's CM/ECF system.

Decl. ¶ 21.)

Lopez spun around and ran back down the hallway. (*Id.* ¶ 22.) Officer Walb opened the door, turned to the right, and continued forward in the hallway. (Walb Dep. 129:7-9.) There was no ambient light or windows, so Officer Walb turned on the flashlight on his MP-5 weapon, which clearly illuminated the scene. (Walb Dep. 27:22-28:8; Walb Decl. ¶ 25.) All three officers moved down the hallway in a diagonal echelon formation with their MP-5 machine guns pointed at Lopez. (Walb Decl. ¶ 26.)

The parties dispute Lopez's next movements before Officer Walb shot him. According to Officer Walb, he shouted several times at Lopez at the top of his lungs "get down" and "take your hands out of your pockets." (Walb Dep. 28:9-29:16, 129:24-130:2, 138:5-22; Walb Decl. ¶ 27.) Officer Walb never saw Lopez's left hand come out of his pocket. (Walb Dep. 29:17-22, 130:8-22, 148:16-25.) Lopez proceeded down the hall until he reached Apartment #58 and turned away from Officer Walb, but Lopez could not get in the door. (Walb Dep. 130:23-131:3; Walb Decl. ¶¶ 28-30.) Officer Scott shouted "left hand, left hand." (Walb Decl. ¶ 32; Walb Dep. 135:11-13.) Officer Walb told Lopez to put his hands up. (Walb Dep. 131:6-7.) Lopez's left hand remained in his pocket, and Lopez raised his right hand up, but not completely and still guarded it towards his body. (Walb Dep. 131:8-12; Walb Decl. ¶¶ 35-37.) Lopez started slowly kneeling down as Officer Walb was coming toward him. (Walb Dep. 131:18-22; Walb Decl. ¶ 37.) However, Lopez was not going to the ground as ordered. (Walb Decl. ¶ 37.) Lopez suddenly turned his body and head slightly to the right. (*Id.* ¶ 39.)

According to Officer Pickett, he entered the third floor hallway after Officer Walb, and Officer Scott was behind him. (Dkt. No. 50-12, Pickett Dep. 9:13-10:5.) Officer Picket said "Police. Stop." two or three times in a loud and commanding voice, and also heard Officer Walb tell Lopez "Police. Stop." (Pickett Dep. 14:5-15:21; Dkt. No. 48-12, Pickett Decl. ¶¶ 27-28, 30-31.) Officer Pickett saw Lopez's left hand in his left front shorts pocket as Lopez was just beginning to step away from the door of

Apartment #58. (Pickett Dep. 18:2-7.) He also saw Lopez make an exaggerated move with his left hand into his left front shorts pocket. (Pickett Dep. 25:10-16; Pickett Decl. ¶¶ 33-36.) Officer Scott was shouting "Left hand! Left hand!" (Pickett Decl. ¶ 37.) Lopez began turning towards the officers, to the right. (Pickett Dep. 30:12-18; Pickett Decl. ¶ 38.)

According to Officer Scott, in the third floor hallway, he was behind Officer Pickett, who was behind Officer Walb. (Dkt. No. 48-13, Scott Decl. ¶¶ 21-22.) Officer Scott saw Lopez step out of the alcove of Apartment #58, and begin moving away from the officers. (Dkt. No. 50-13, Scott Dep. 36:12-23; Scott Decl. ¶ 24.) Officer Scott shouted, "Don't move! Get down! Get down!" and he also heard Officer Walb say "Get down." (Scott Dep. 37:24-38:7; Scott Decl. ¶ 25.) Officer Scott saw Lopez's hand, which had nothing in it, go into his pocket or the front of his waistband. (Scott Dep. 46:20-25; Scott Decl. ¶ 26.) Officer Scott yelled "Left hand! Left hand! Watch his left hand!" (Scott Decl. ¶ 29.) Lopez had his right side facing Officer Scott, but Officer Scott could not give an exact angle. (Scott Dep. 35:12-24.)

Officer Walb then shot Lopez, from a distance of 15 to 20 feet, at 12:59 p.m. on the afternoon of January 17, 2013. (Walb Dep. 6:18-7:8, 131:23-132:2.) Officer Walb fired two, three-round bursts from his MP-5 weapon. (Walb Dep. 7:9-8:13; Walb Decl. ¶ 43.) The second burst was directly after the first. (Walb Dep. 8-13.) According to all three officers, Lopez was standing when Officer Walb shot him. (Walb Dep. 11:19-12:21; Pickett Dep. 29:9-31:3; Scott Dep. 38:11-21.) Officer Walb stated that Lopez was turning towards him, so that the right side of Lopez's body was facing him, when he fired his weapon. (Walb Dep. 10:10-11:1.) At the time he shot Lopez, the angle of Officer Walb's weapon was parallel or just slightly lower than parallel to the ground. (*Id.* 132:6-14.) Three of the six bullets hit Lopez: one to the back of the head, one to the lower right back, and one to the right side of the upper-mid back. (Dkt. 50-10 at

2-3.[3])  After he was shot, Lopez immediately fell forward and was pronounced dead at the scene.  (Walb. Decl. ¶ 44.)

The parties' ballistics experts agree that, based on the gun shot wound paths, Lopez could not have been either standing or fully prone when the shots impacted Lopez.  (Dkt. No. 50-14, Martini Dep. 76:1-22; Dkt. No. 50-17, Martini Report at 38; Dkt. No. 52-5, Haag Decl. ¶¶ 8, 19.)  Rather, Lopez was in a forward descending motion at the time the bullets struck him.  (Dkt. No. 50-15, Martini Dep. 136:22-137:1; Dkt. No. 50-17 at 38; Haag Decl. ¶ 18(f).)  Plaintiffs' ballistic expert concluded that when he was shot Lopez was either transitioning from a standing to a kneeling position, in a kneeling position, or transitioning from a kneeling position into a prone position.  (Dkt. No. 50-17 at 38-39.)

Plaintiffs' ballistics expert also concluded that the wound paths are inconsistent with Lopez turning to his right when he was shot by Officer Walb.  (Dkt. No. 50-17 at 40.)  However, Defendants' ballistics expert concluded that the wound paths are not inconsistent with Lopez turning to his right when Officer Walb decided to fire because Lopez could have changed positions immediately before and while being struck.  (Dkt. No. 52-8, Kapelsohn Decl. ¶¶ 5-7.)

After the shooting, officers searched Lopez's body.  (Luth Decl. ¶¶ 12, 15.) Lopez's left hand was concealed underneath his chest area on the left side.  (Dkt. No. 50-19, DeWitt Report at 3).  Officers did not find a gun on Lopez.  (Luth Decl. ¶¶ 12, 15; Walb Dep. 138:23-25.)  However, officers did find on Lopez one syringe loaded with a dark brown liquid, one blue balloon wrapped in a napkin, three "bindles," and another "bindle" held in a metal container.  (Luth Decl. ¶ 15.)  The blue balloon and "bindles" all contained apparent narcotics.  (*Id.* ¶¶ 16-17.)  The autopsy toxicology report revealed the testing of peripheral blood detected methamphetamine (1.1 mg/L), amphetamine (0.07 mg/L), trace ephedrine and morphine (0.23 mg/L).  (Dkt. No. 48-

---

[3]Page number citations such as this one are to the page numbers reflected on the Court's CM/ECF system and not to page numbers assigned by the parties.

15.)

The day after Officer Walb shot and killed Lopez, Officers Walb, Pickett, and Scott attended a debriefing with three "peer support officers" and a psychologist. (Dkt. No. 52-1 at 37).[4]  At this debrief, "each person tells their side of what happened." (*Id.*) On the advice of counsel, Officers Walb and Scott refused to answer further deposition questions concerning this debriefing. (*Id.* at 38-39; Walb Dep. 74:17-76:25, 78:16-79:14; Scott Dep. 22:6-24:10; Dkt. No. 52-4, Scott Dep. 18:9-13.)

### III.  PROCEDURAL HISTORY

Plaintiffs filed this action on September 18, 2013. (Dkt. No. 1.)  On March 11, 2014, Plaintiffs filed the operative First Amended Complaint ("FAC") against Defendants City of San Diego, Kristopher Michael Walb, Mark Hanten, and William Landsdowne. (Dkt. No. 18.)  The latter two defendants were later dismissed. (Dkt. Nos. 30, 38.)

In the FAC, Plaintiffs allege nine claims: (1) excessive force under 42 U.S.C. § 1983; (2) wrongful death under § 1983; (3) right of association under § 1983; (4) failure to properly train under § 1983; (5) failure to properly supervise under § 1983; (6) wrongful death under California Code of Civil Procedure § 377.60; (7) battery; (8) negligence; and (9) violation of California Civil Code § 52.1. (Dkt. No. 18.)

On October 10, 2014, Defendants filed the instant Motion for Summary Judgment. (Dkt. No. 48.)  On November 14, 2014, Plaintiffs filed their response. (Dkt. No. 50.)  On November 17, 2014, Defendants belatedly filed their separate statement of undisputed material facts.[5] (Dkt. No. 51.)  On November 28, 2014, Defendants filed

---

[4]Some of Plaintiffs' cited portions of the Walb and Scott depositions (i.e., Walb Dep. 72:19-25; Scott Dep. 17:10-14, 20:21-25) are not included in the record, but the parties do not dispute these facts. (Dkt. No. 52-1 at 37-39.)

[5]Plaintiffs contend that Defendants' Motion for Summary Judgment should be denied because Defendants failed to include a separate statement of undisputed material facts, in violation of the Court's Chamber Rules. (Dkt. No. 50-1 at 7.) Defendants subsequently filed a late separate statement of undisputed material facts,

1   their reply.[6]  (Dkt. No. 52.)

2   ## IV.  LEGAL STANDARD

3       Federal Rule of Civil Procedure 56 empowers the Court to enter summary

4   judgment on factually unsupported claims or defenses, and thereby "secure the just,

5   speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477

6   U.S. 317, 325, 327 (1986). Summary judgment is appropriate if the "pleadings,

7   depositions, answers to interrogatories, and admissions on file, together with the

8   affidavits, if any, show that there is no genuine issue as to any material fact and that the

9   moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact

10  is material when it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*,

11  477 U.S. 242, 248 (1986).

12      The moving party bears the initial burden of demonstrating the absence of any

13  genuine issues of material fact. *Celotex Corp.*, 477 U.S. at 323.  The moving party can

14  satisfy this burden by demonstrating that the nonmoving party failed to make a

15  showing sufficient to establish an element of his or her claim on which that party will

16  bear the burden of proof at trial. *Id.* at 322-23.  If the moving party fails to bear the

17  initial burden, summary judgment must be denied and the court need not consider the

18  nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60

19  (1970).

20      Once the moving party has satisfied this burden, the nonmoving party cannot rest

21  on the mere allegations or denials of his pleading, but must "go beyond the pleadings

22  and by her own affidavits, or by the 'depositions, answers to interrogatories, and

23  _____

24  in which they contend that there is no prejudice to Plaintiffs as to the late filing because the facts contained in the separate statement mirror the facts in their Motion for

25  Summary Judgment. (Dkt. No. 51.)  While the Court reminds Defendants of the need to follow Chambers Rules, the Court declines to deny Defendants' Motion for

26  Summary Judgment on this ground.

27      [6]Defendants contend that Plaintiffs have waived all of their claims by failing to adequately address them. (Dkt. No. 52 at 10.)  While it would have been helpful for

28  Plaintiffs to separately address each claim, the Court declines to grant Defendants' Motion for Summary Judgment on this ground.

admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Id.* at 325. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In making this determination, the court must "view[ ] the evidence in the light most favorable to the nonmoving party." *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001). The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. *Anderson*, 477 U.S. at 255.

## V. DISCUSSION

### 1.    Excessive Force Under the Fourth Amendment

Plaintiffs assert that Officer Walb's use of deadly force was excessive under the Fourth Amendment. (Dkt. No.18 ¶¶ 20-28.) Defendants move for summary judgment on the ground that Officer Walb is entitled to qualified immunity. (Dkt. No. 48-1 at 15.)

Section 1983 provides plaintiffs with a cause of action when a person acting under the color of state law deprives them of any federal constitutional right. 42 U.S.C. § 1983. Under the Fourth Amendment, law enforcement may use "objectively reasonable" force to carry out seizures, and objective reasonableness is determined by an assessment of the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989). An officer's use of deadly force is reasonable only if "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3 (1985). The Ninth Circuit has repeatedly noted that summary judgment in excessive force cases should be granted "sparingly" because the reasonableness standard "nearly always requires a jury to sift through disputed factual contentions." *Torres v. City of Madera*,

648 F.3d 1119, 1125 (9th Cir. 2011) (citation and internal quotation marks omitted).

In the deadly force context, courts cannot "simply accept what may be a self-serving account by the police officer." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). "Because the person most likely to rebut the officers' version of events – the one killed – can't testify, '[t]he judge must carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts.'" *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014) (quoting *Scott*, 39 F.3d at 915). "This includes 'circumstantial evidence that, if believed, would tend to discredit the police officer's story.'" *Id.* (quoting *Scott*, 39 F.3d at 915).

"An officer using deadly force is entitled to qualified immunity, unless the law was clearly established that the use of force violated the Fourth Amendment." *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010). Qualified immunity involves a two-part inquiry: (1) "whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right," and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

### A.    Violation of the Fourth Amendment

Defendants contend that, based on the totality of the circumstances, it was objectively reasonable for Officer Walb to perceive that Lopez posed an imminent deadly threat. (Dkt. No. 48-1 at 15-19.) Defendants argue that Officer Walb was aware that Lopez was a parolee at large and a violent gang member who would be carrying a weapon in his pocket, that Lopez had fled to avoid arrest, and that Lopez refused to follow commands to get down and take his hand out of his pocket with three machine guns pointed at him. (*Id.* at 17, 19.)

Plaintiffs dispute the officers' account of Lopez's actions and rely heavily on the Ninth Circuit's recent decision in *Cruz*. (Dkt. No. 50-1 at 4-7.) Defendants argue that

1   *Cruz* is distinguishable because here the officers' version of the events is not
2   inconsistent with the known facts.  (Dkt. No. 52 at 2.)

3      In *Cruz*, the Ninth Circuit reversed the district court's grant of summary
4   judgment in a deadly force case alleging Fourth and Fourteenth Amendment claims,
5   as well as wrongful death under California law, because there was "circumstantial
6   evidence that could give a reasonable jury pause" regarding whether officers saw Cruz
7   reach for his waistband before they shot and killed him.  *Cruz*, 765 F.3d at 1079.  The
8   officers had executed a traffic stop on Cruz, a discharged parolee whose prior
9   convictions included a felony involving a firearm, after a confidential informant
10  reported that Cruz was a gang member who sold drugs, that he was carrying a gun in
11  his waistband, and that he had made it clear that he was not going back to prison.  *Id.*
12  at 1077-78.  After Cruz unsuccessfully tried to escape in his vehicle, the police drew
13  their weapons and shouted at him to get on the ground as he was emerging from his
14  vehicle.  *Id.* at 1078.  According to four of the five officers, Cruz ignored their
15  commands and instead reached for the waistband of his pants.  *Id.*  Fearing that he was
16  reaching for a gun, all five officers opened fire, killing Cruz.  *Id.*  Officers did not find
17  a gun on Cruz, but did recover a loaded gun from the passenger seat.  *Id.*

18     The Ninth Circuit explained that for the district court ruling on the officers'
19  motion for summary judgment, the key question was "Could any reasonable jury find
20  it more likely than not that Cruz *didn't* reach for his waistband?"  *Id.* at 1079.  The
21  Ninth Circuit concluded that, despite the officers' testimony, there was circumstantial
22  evidence that could cause a jury to reasonably conclude that the officers lied.  *Id.* at
23  1079-80.  The "[m]ost obvious is the fact that Cruz didn't have a gun on him, so why
24  would he have reached for his waistband? . . . [F]or him to make such a gesture when
25  *no* gun is there makes no sense whatsoever."  *Id.* at 1079.  The Ninth Circuit also noted
26  that there were other aspects of the officers' story which a jury might find troubling and
27  implausible.  *Id.* at 1080.  Accordingly, the Ninth Circuit held that the district court
28  erred in granting summary judgment for the officers, and reversed.  *Id.*

Here, the key question is: Could any reasonable jury find it more likely than not that Lopez *didn't* comply with the officers' orders to remove his hand from his pocket and get down?  As in *Cruz*, no gun was found on Lopez, which Plaintiffs argue could give a reasonable jury pause as to whether Lopez did in fact keep his hand in pocket, despite facing three armed SRT officers who were pointing machine guns at him and commanding him to get down and take his hands out of his pockets. (Dkt. No. 50-1 at 24-25.)  Like in *Cruz*, "for him to make such a gesture when *no* gun is there makes no sense whatsoever."  *Cruz*, 765 F.3d at 1079.  Defendants contend that *Cruz* is distinguishable because the evidence supports two possible explanations for Lopez's seemingly irrational movements: (1) the drugs found in Lopez's system, which may have caused him to behave erratically; and/or (2) the apparent drugs found on Lopez's body, which he may have been attempting to discard.  (Dkt. No. 52 at 3-4.)  However, while a reasonable jury could believe that Lopez kept his hand in his pocket for Defendants' proffered reasons, or some other reason altogether, "the jury could also reasonably conclude that the officers lied."  *Cruz*, 765 F.3d at 1080.

Further, Plaintiffs have submitted other circumstantial evidence that could cause a reasonable jury to question whether the officers saw Lopez with his left hand in his pocket at the time Officer Walb shot him.  For example, Officers Walb and Scott testified that Lopez's right side was facing them at the time Lopez was shot, which could raise doubts whether they could see Lopez's left hand due to his body orientation.  (Walb Dep. 10:10-11:1; Scott Dep. 35:12-24.)  Also, the officer who moved Lopez's body reported that Lopez's left hand was concealed underneath his chest area on the left side.  (Dkt. No. 50-19 at 3).  Moreover, the day after the shooting Officers Walb, Pickett, and Scott had a debriefing, about which they refused to answer deposition questions and which might cause a jury to distrust the officers' accounts. (Dkt. No. 52-1 at 37-39.)

In addition, Plaintiffs have submitted circumstantial evidence that could cause a reasonable jury to question the officers' testimony that Lopez was not complying with

their orders to get down. Plaintiffs' ballistics expert concluded that Lopez was moving downward when he was struck by the bullets, and that Lopez could not have been standing or turning to the right at that time, as testified by the officers. (Dkt. No. 50-1 at 20-23.) Plaintiffs contend that this supports that Lopez was complying with the officers' orders to get down when Officer Walb shot him. (*Id.* at 25.) Defendants counter that the officers' account is not inconsistent with Plaintiffs' ballistics expert. (Dkt. No. 52 at 4-7.) Defendants agree that Lopez was in a forward descending motion, and was not standing, when the bullets struck him, but contend that this was due to the first burst of three bullets missing Lopez, and then Lopez crouching and turning back to his left in response before he was hit by the second burst of three bullets. (*Id.*) In other words, Defendants argue that Lopez could have been standing when Officer Walb began to shoot at him, even though Lopez was not standing when the bullets actually hit him. (*Id.*) It is possible that the jury could believe that the ballistics evidence is consistent with the officers' account. However, it is also possible for the jury to reasonably conclude that it is consistent with Plaintiffs' version that Lopez was complying with the officers' orders to get down.

At this stage of the proceedings, the Court does not weigh the evidence or make determinations about credibility. *Anderson*, 477 U.S. at 255; *Cruz*, 765 F.3d at 1080. Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could disbelieve the officers' version of events. *See Cruz*, 765 F.3d at 1080; *Ortega v. San Diego Police Dep't*, No. 12cv87-LAB (JMA), 2014 WL 6388488, at *5-6 (S.D. Cal. Nov. 14, 2014) (denying summary judgment on Fourth Amendment claim in deadly force case because reasonable jury could disbelieve officer's version of events that decedent had reached for the officer's weapon). Therefore, the Court concludes that there is a genuine dispute of material fact as to whether Officer Walb violated the Fourth Amendment.

**B.    "Clearly Established Right"**

Defendants contend that even if Officer Walb violated the Fourth Amendment,

1  he is still entitled to qualified immunity because the alleged right was not clearly
2  established.  (Dkt. No. 48-1 at 20-22.)

3        Case law makes clear that an officer may not use deadly force to apprehend a
4  suspect where the suspect poses no immediate threat to the officer or others.  *Garner*,
5  471 U.S. at 11; *see also Cruz,* 765 F.3d at 1078-79 ("[I]f the suspect *doesn't* reach for
6  his waistband or make some similar threatening gesture, it would clearly be
7  unreasonable for the officers to shoot him after he stopped his vehicle and opened the
8  door.").  On the other hand, it is not constitutionally unreasonable to use deadly force
9  "[w]here the officer has probable cause to believe that the suspect poses a threat of
10 serious physical harm, either to the officer or to others."  *Garner*, 471 U.S. at 11; *see
11 also Estate of Moppin-Buckskin v. City of Oakland*, No. 08cv4328 CW, 2010 WL
12 147976, at *6 (N.D. Cal. Jan. 12, 2010) (holding that deadly force was justified, even
13 though it turned out that suspect did not have a weapon, where the suspect acted
14 belligerently, was reluctant to comply with commands, reached towards his waistband,
15 and stated that he did not care if the officers shot him because he had been shot before).

16       Defendants repeat their arguments that the totality of the circumstances would
17 lead an objectively reasonable officer to believe that Officer Walb faced a life
18 threatening situation.  (Dkt. No. 48-1 at 21.)   However, if a jury were to find that
19 Lopez was getting down and did not keep his hand in his pocket or make some similar
20 threatening gesture, and that Officer Walb violated his Fourth Amendment rights by
21 shooting him while he posed no significant threat, the violation would be clearly
22 established under the law set forth in *Garner* governing the use of deadly force to effect
23 a seizure of a suspect.  Therefore, the Court concludes that summary judgment on
24 qualified immunity against Plaintiffs' Fourth Amendment claim is not warranted.

25       Accordingly, Defendants' Motion for Summary Judgment is **DENIED** with
26 respect to Plaintiffs' first claim for excessive force under the Fourth Amendment.

27 **2.**    <u>**Wrongful Death Under Section 1983**</u>

28       In their second claim, labeled "Wrongful Death – 42 U.S.C. § 1983," Plaintiffs

allege that Officer Walb's use of deadly force "deprived Angel Lopez of his rights under the United States Constitution to be free from the use of excessive force by law enforcement and punishment without due process." (Dkt. No. 18 ¶ 31.) Plaintiffs do not specify under which constitutional provision this claim arises.

Defendants contend that Plaintiffs' second claim should be dismissed based on the same "facts, arguments and reasoning" regarding Plaintiffs' first claim for excessive force under the Fourth Amendment. (Dkt. No. 48-1 at 22.) Because the Court concluded that summary judgment was not warranted on Plaintiffs' first claim, Defendants have failed to show that summary judgment is warranted on Plaintiffs' second claim.

Accordingly, Defendants' Motion for Summary Judgment is **DENIED** with respect to Plaintiffs' second claim for wrongful death under section 1983.

### 3.    Right of Association Under the Fourteenth Amendment

Plaintiffs assert that Officer Walb's use of deadly force unconstitutionally interfered with their rights to familial relationships with their husband and father in violation of the Fourteenth Amendment. (Dkt. No. 18 ¶¶ 34-38.) Defendants contend that Officer Walb's conduct did not violate the Fourteenth Amendment. (Dkt. No. 48-1 at 22-24.)

Spouses and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their spouse or parent through official conduct. *See Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013) (children); *Morales v. City of Delano*, 852 F. Supp. 2d 1253, 1273-74 (E.D. Cal. 2012) (spouse and children).

The Fourteenth Amendment's Due Process Clause creates a right to be free from "executive abuse of power . . . which shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). "In determining whether excessive force shocks the conscience, the court must first ask whether the circumstances are such that actual deliberation by the officer is practical." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th

Cir. 2010) (internal quotations and alterations omitted). If the officer in question was faced with a time frame where actual deliberation was practical, a plaintiff may establish a Fourteenth Amendment violation by showing that the officer "acted with deliberate indifference." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). Otherwise, if the officer "faced an evolving set of circumstances that took place over a short time period necessitating 'fast action,'" a plaintiff must make a higher showing that the officer "acted with a purpose to harm" the plaintiff. *Id.* at 1139 (quoting *Lewis*, 523 U.S. at 853). "[T]he overarching test under either is whether the officer's conduct 'shocks the conscience.'" *Id.*

Defendants contend that the more stringent purpose to harm standard applies here. (Dkt. No. 48-1 at 23-24.) Plaintiffs do not address this issue. (Dkt. No. 50-1.)

The Court determines that the purpose to harm standard applies here because Officer Walb faced a fast paced, evolving situation with insufficient time for deliberation. Under the purpose to harm standard, a plaintiff must show that an officer's purpose was "to cause harm unrelated to the legitimate object of arrest." *Porter*, 546 F.3d at 1140 (citation and internal quotation marks omitted). It is precisely "the intent to inflict force beyond that which is required by a legitimate law enforcement objective that 'shocks the conscience' and gives rise to liability under § 1983. . . ." *Id.* (citation and internal quotation marks omitted).

Plaintiffs have produced no evidence that Officer Walb had any ulterior motive for firing his weapon at Lopez. *See Gonzalez v. City of Anaheim*, 747 F.3d 789, 797-98 (9th Cir. 2014) (en banc) (affirming summary judgment on Fourteenth Amendment substantive due process claim arising from deadly force, even though genuine dispute regarding Fourth Amendment excessive force claim, because plaintiffs produced no evidence that the officers had any ulterior motives for using force); *Hayes v. County of San Diego*, 736 F.3d 1223, 1230-31 (9th Cir. 2013) (affirming summary judgment on Fourteenth Amendment substantive due process claim in deadly force case because there was no evidence that the deputies fired their weapons for any purpose other than

1  self-defense).  Therefore, Plaintiffs failed to raise a genuine issue of material fact

2  regarding their substantive due process claim.

3      Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** with

4  respect to Plaintiffs' third claim for right of association under the Fourteenth

5  Amendment.

6  **4.    Failure to Properly Train Under Section 1983**

7      Plaintiffs concede that summary judgment is appropriate on their fourth claim

8  for failure to properly train, and do not object to the dismissal of this claim.  (Dkt. No.

9  50-1 at 28.)  Accordingly, Defendants' Motion for Summary Judgment is **GRANTED**

10  with respect to Plaintiffs' fourth claim for failure to properly train.

11  **5.    Failure to Properly Supervise Under Section 1983**

12      Plaintiffs also concede that summary judgment is appropriate on their fifth claim

13  for failure to properly supervise, and do not object to the dismissal of this claim.  (Dkt.

14  No. 50-1 at 28.)   Accordingly, Defendants' Motion for Summary Judgment is

15  **GRANTED** with respect to Plaintiffs' fifth claim for failure to properly supervise.

16  **6.    Wrongful Death Under California Code of Civil Procedure § 377.60**

17      Defendants move for summary judgment on Plaintiffs' state law wrongful death

18  claim on the grounds that California Government Code § 820.2 immunizes public

19  officers like Officer from suit for all discretionary acts other than excessive or

20  unreasonable use of force.  (Dkt. No. 48-1 at 27-28.)  Under section 820.2, "a public

21  employee is not liable for an injury resulting from his act or omission where the act or

22  omission was the result of the exercise of the discretion vested in him, whether or not

23  such discretion be abused."  Cal. Gov't Code § 820.2.  "But 'a police officer does not

24  have discretionary immunity from liability for the use of unreasonable force in making

25  an arrest.'"  *Ortega*, 2014 WL 6388488, at \*12 (quoting *Scruggs v. Haynes*, 252 Cal.

26  App. 2d 256, 267 (1967)).

27      Defendants contend that Officer Walb is immune from suit unless he used

28  excessive force.  (Dkt. No. 48-1 at 28.)  However, the Court already determined that

there was a genuine dispute of material fact regarding whether Officer Walb's use of deadly force was excessive.

Accordingly, Defendants' Motion for Summary Judgment is **DENIED** with respect to Plaintiffs' sixth claim for wrongful death under California Civil Procedure § 377.60.

### 7. Battery

Defendants also move for summary judgment on Plaintiffs' battery claim. (Dkt. No. 48-1 at 28-29.)  Under California law, a plaintiff bringing a battery claim against a law enforcement official has the burden of proving the officer used unreasonable force. *See Saman v. Robbins*, 173 F.3d 1150, 1157 n.6 (9th Cir. 1999) ("A prima facie case for battery is not established under California law unless the plaintiff proves that an officer used unreasonable force against him to make a lawful arrest or detention.").

"Because the Court has already determined that Plaintiffs' excessive force claim survives summary judgment, their . . . battery claim is also viable." *Ortega*, 2014 WL 6388488, at * 12; *see also Nelson v. City of Davis*, 709 F. Supp. 2d 978, 992 (E.D. Cal. 2010), *aff'd*, 685 F.3d 867 (9th Cir. 2012) ("Because the same standards apply to both state law assault and battery and Section 1983 claims premised on constitutionally prohibited excessive force, the fact that Plaintiff's § 1983 claims under the Fourth Amendment survive summary judgment also mandates that the assault and battery claims similarly survive.")  A genuine dispute of material fact remains as to whether Officer Walb used unreasonable force.

Accordingly, Defendants' Motion for Summary Judgment is **DENIED** with respect to Plaintiffs' seventh claim for battery.

### 8. Negligence

Plaintiffs allege that Officer Walb was negligent in his use of deadly force. (Dkt. No. 18 ¶¶ 76-78.)  "[I]n order to prove facts sufficient to support a finding of negligence, a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the

resulting injury." *Hayes v. County of San Diego*, 305 P.3d 252, 255 (Cal. 2013). "[P]eace officers have a duty to act reasonably when using deadly force." *Id.* at 256. "The reasonableness of an officer's conduct is determined in light of the totality of circumstances." *Id.*

Defendants contend that Plaintiffs' claim that the shooting was negligent fails because Officer Walb's actions were reasonable. (Dkt. No. 48-1 at 29-30.) However, the Court already determined that there is a genuine dispute whether Officer Walb's actions were reasonable.

Defendants also contend that Plaintiffs' negligence claim fails because it rests on the same facts as their section 1983 claims. (Dkt. No. 48-1 at 29-30.) They cite *Whitefeld v. Tri-Metropolitan Transp. Dist.*, No. 06-cv-1655-HA, 2009 WL 839484, at *11 (D. Or. Mar. 30, 2009) for the proposition that "a state common-law claim of negligence may be maintained separately from a § 1983 claim only when the negligence claim is based on facts that are different from the facts on which the § 1983 claims are based." However, Defendants rely only on an Oregon district court case, which focuses on the "law of th[at] District." *Id.*

Accordingly, Defendants' Motion for Summary Judgment is **DENIED** with respect to Plaintiffs' eighth claim for negligence premised on Officer Walb shooting Lopez.

However, Plaintiffs also allege that the City of San Diego was negligent in its training and supervision. (Dkt. No. 18 ¶¶ 80-83.) Because Plaintiffs' concede that summary judgment is appropriate on their separate failure to properly train and failure to properly supervise claims (Dkt. No. 50-1 at 28), the Court also **GRANTS** Defendants' Motion for Summary Judgment on Plaintiffs' negligence claim premised on training and supervision.

## 9.   Violation of California Civil Code § 52.1 (Bane Act)

Finally, Defendants move for summary judgment on Plaintiffs' claim for violation of California Civil Code § 52.1, also known as the Bane Act. (Dkt. No. 48-1

at 30-31.)   The Bane Act provides a private cause of action against anyone who "interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by an individual or individuals of rights secured by the Constitution or laws of the United States, or laws and rights secured by the Constitution or laws of California."   Cal. Civil Code § 52.1(a).  The Bane Act requires "an attempted or completed act of interference with a legal right, accompanied by a form of coercion."  *Jones v. Kmart Corp.*, 949 P.2d 941, 944 (1998).  Although the Bane Act was initially considered to apply only to hate crimes, the California Supreme Court subsequently broadened its application and held that "plaintiffs need not allege that defendants acted with discriminatory animus or intent, so long as those acts were accompanied by the requisite threats, intimidation, or coercion."  *Venegas v. County of Los Angeles*, 87 P.3d 1, 14 (Cal. 2004) (allowing Bane Act claim for unlawful seizure).  "[T]he elements of the excessive force claim under § 52.1 are the same as under § 1983."  *Cameron v. Craig*, 713 F.3d 1012, 1022 (9th Cir. 2013).

Defendants contend that a ruling in favor of Defendants on the section 1983 excessive force claim precludes Plaintiffs' Bane Act claim.  (Dkt. No. 48-1 at 30-31.)  However, this argument is unavailing because the Court already denied summary judgment on the section 1983 excessive force claim.

Defendants also argue, relying on the California Appeals Court's decision in *Shoyoye v. County of Los Angeles*, that to sustain a Bane Act claim "'[t]he act of interference with a constitutional right must itself be deliberate or spiteful,'" and "'[t]he statute requires a showing of coercion independent from the coercion inherent in the wrongful detention itself.'" (Dkt. No. 48-1 at 31 (quoting *Shoyoye v. County of Los Angeles*, 203 Cal. App. 4th 947, 959 (Ct. App. 2012).)[7]  In *Shoyoye*, a clerical error resulted in the unlawful detention of a prisoner that had been ordered released, and the

---

[7]In their opposition, Plaintiffs do not offer legal argument regarding their Bane Act claim, other than listing it among the claims that are "amply supported by the evidence and should remain for trial." (Dkt. No. 50-1 at 28.)

California Appeals Court rejected the prisoner's Bane Act claim because "[t]he apparent purpose of the statute is not to provide relief for an overdetention brought about by human error" but rather by "intentional conduct." *Shoyoye*, 203 Cal. App. 4th at 959.

However, after *Shoyoye* was decided, the same California Court of Appeal decided *Bender v. County of Los Angeles*, which held that the Bane Act applied to an excessive force claim which involved an unlawful arrest, but explicitly left open the issue of whether the Bane Act would apply in cases involving the alleged use of force during an otherwise lawful arrest based on probable cause. *Bender v. County of Los Angeles*, 217 Cal. App. 4th 968, 978 (Ct. App. 2013). In *Bender*, the court distinguished *Shoyoye*, and determined that "the Bane Act applie[d] because there was a Fourth Amendment violation – an arrest without probable cause – accompanied by the beating and pepper spraying of an unresisting plaintiff, i.e., coercion that is in no way inherent in an arrest, either lawful or unlawful." *Id*. The court noted "not every wrongful detention" and not "every case of excessive force in the effectuation of an otherwise lawful arrest is a violation of the Bane Act." *Id.* at 981. Rather, the court held that "a wrongful detention that is 'accompanied by the requisite threats, intimidation, or coercion' (quoting *Venegas*, 87 P.3d at 14) – 'coercion independent from the coercion inherent in the wrongful detention itself' that is 'deliberate or spiteful' (quoting *Shoyoye*, 203 Cal. App. 4th at 959) – is a violation of the Bane Act." *Id.*

The federal district courts are split regarding whether *Shoyoye* applies to all Bane Act claims, and whether a plaintiff bringing a Bane Act claim must introduce independent evidence showing threats, intimidation, or coercion, in addition to showing a constitutional violation. *See Gregory v. City of Vallejo*, No. 12-cv-320-KJM-KJN, 2014 WL 5473075, at *8 (E.D. Cal. Oct. 28, 2014). Some courts, interpreting *Shoyoye* narrowly, have held that the essence of *Shoyoye* is that the Bane Act "was not intended to redress harms 'brought about by human error rather than

intentional conduct.'"  *Bass v. City of Fremont*, No. 12-cv-4943 THE, 2013 WL 891090, at *5 (N.D. Cal. Mar. 8, 2013) (quoting *Shoyoye*, 203 Cal. App. 4th at 959); *see also D.V. v. City of Sunnyvale*, No. 14-cv-2155-RMW, 2014 WL 4072338, at *4-5 (N.D. Cal. Aug. 14, 2014) (noting that "the great weight of authority in the Northern District of California has . . . confined *Shoyoye* to circumstances involving negligent conduct").  Based on this reasoning, courts have applied the Bane Act to a claim of unlawful arrest or excessive force alone.  *See, e.g., Hampton v. City of Oakland*, No. 13-cv-3094 DMR, 2014 WL 5600879, at *18 (N.D. Cal. Nov. 3, 2014) (denying summary judgment on Bane Act claim premised on unlawful arrest and concluding that a Bane Act claim "does not require threats, coercion, or intimidation independent from the threats, coercion, or intimidation inherent in the alleged constitutional or statutory violation" (citation and internal quotation marks omitted)); *Rodriguez v. City of Modesto*, No. 10-cv-01370-LJO, 2013 WL 6415620, at *10-13 (E.D. Cal. Dec. 9, 2013) (denying motion to dismiss because "[a] plaintiff bringing a Bane Act excessive force need not allege a showing of coercion independent from the coercion inherent in the use of force").

Other courts have held that something more than an inherently coercive violation is required for a claim under the Bane Act, and have rejected Bane Act claims based on excessive force during or after arrests that were otherwise lawful, where plaintiffs made no showing of coercion separate from their underlying excessive force claim. *See, e.g., Ortega*, 2014 WL 6388488, at *11 (granting summary judgment on Bane Act claim, even though genuine dispute whether deadly force was excessive, because plaintiffs made no showing of coercion separate and apart from their underlying Fourth and Fourteenth Amendment claims); *Luong v. City & County of San Francisco*, No. 11-cv-5661 MEJ, 2012 WL 5869561, at *8 (N.D. Cal. Nov. 19, 2012) (granting summary judgment on Bane Act claim, even though genuine dispute whether force involving officers stepping on one arrestee and throwing another arrestee against the wall was excessive, because plaintiffs made no showing of independent coercion outside of their

underlying constitutional claims).

In the absence of binding authority, the Court finds persuasive the line of cases permitting Bane Act claims based on the same conduct as an underlying constitutional violation. *Shoyoye* is distinguishable on its facts. There, the plaintiff was lawfully arrested but detained for much longer than permitted by law because of a negligent clerical error. *Shoyoye*, 203 Cal. App. 4th at 951-53. In contrast, here there is a genuine dispute whether the deadly force  was deliberate and "intended to interfere with the exercise or enjoyment of a constitutional right." *Id.* at 957-58.

Accordingly, Defendants' Motion for Summary Judgment is **DENIED** with respect to Plaintiffs' ninth claim for violation of California Civil Code § 52.1 (Bane Act).

## VI.  CONCLUSION AND ORDER

For the foregoing reasons, **IT IS HEREBY ORDERED:**

(1)   the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment (Dkt. No. 48.)

(2)   the Court **GRANTS** summary judgment as to Plaintiffs' third claim for right of association under the Fourteenth Amendment, fourth claim for failure to properly train, fifth claim for failure to properly supervise, and eighth claim for negligence premised on training and supervision

(3)   the Court **DENIES** summary judgment as to Plaintiffs' first claim for excessive force under the Fourth Amendment, second claim for wrongful death under section 1983, sixth claim for wrongful death under California Civil Procedure § 377.60, seventh claim for battery, eighth claim for negligence premised on Officer Walb shooting Lopez, and ninth claim for violation of California Civil Code § 52.1 (Bane Act)

1

2   DATED:  December 18, 2014

3

4   HON. GONZALO P. CURIEL
    United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28