UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE ESTATE OF ANGEL LOPEZ, by its successor in interest Lydia Lopez; LYDIA LOPEZ, in her own right; and ANGEL LOPEZ JR AND HECTOR LOPEZ, by and through their guardian ad litem, LYDIA LOPEZ,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SAN DIEGO, KRISTOPHER WALB, and DOES 1-30,<br><br>Defendants. | Case No.: 13-cv-2240-GPC-MDD<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR A NEW TRIAL**<br><br>[Dkt. No. 214] |

Presently before the Court is a Motion for New Trial filed by Plaintiffs the Estate of Angel Lopez, Lydia Lopez, Angel Lopez, Jr., and Hector Lopez, by and through their Guardian Ad Litem, Lydia Lopez ("Plaintiffs") on November 22, 2017. Dkt. No. 214. On December 8, 2017, Defendants Kristopher Walb and the City of San Diego ("Defendants") filed an opposition. Dkt. No. 223. Plaintiffs filed their reply on December 15, 2017. Dkt. No. 224. On December 18, 2017, Plaintiffs withdrew and re-filed their reply with

1

accompanying supplemental exhibits.[1] Dkt. Nos. 225-27. Defendants filed an objection to the reply and the late-filed supplemental exhibits on December 20, 2017. Dkt. No. 228.

A jury trial was held beginning on August 23, 2017 through September 1, 2017. Dkt. Nos. 157, 185. On August 23, 2017, Plaintiffs made a motion for mistrial after Defendant's Opening Statement, which the Court denied. Dkt. No. 157. On August 30, 2017, Plaintiffs renewed their motion for mistrial, which the Court denied. Dkt. No. 175. Plaintiffs again sought mistrial on September 1, 2017, which was denied. Dkt. Nos. 180, 185. On September 5, 2017, the jury returned a verdict against Plaintiffs on their claims for a Section 1983 violation, battery, Civil Code 52.1 (California's Bane Act) and negligent use of force. Dkt. No. 193.

Based on a review of the briefing, the relevant record, and the applicable law, the Court **DENIES** Plaintiffs' motion for a new trial. The Court deems this motion suitable for disposition without oral argument pursuant to Civil Local Rule 7.1(d)(1).

## I. Legal Standard

Federal Rule of Civil Procedure ("Rule") 59(a)(1) provides that the court, on a motion, may grant a new trial on all or some of the issues "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court. . . ." Fed. R. Civ. P. 59(a)(1)(A). A motion to grant new trial must be filed no later than 28 days after the entry of judgment. Fed. R. Civ. P. 59(b).[2] The court is "bound by those grounds that have been historically recognized." *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020,

---

[1] The Court admonishes Plaintiffs for their tardiness in filing the supplemental exhibits. However, the Court will consider these exhibits as they are transcript excerpts that are a part of the public record. With regard to Defendants' Objection, the Court observes that Defendants do not identify with any specificity particular arguments or new facts raised in the first instance on reply.

[2] Judgment in this case was not issued until October 25, 2017 and Plaintiffs' motion was timely filed on November 22, 2017. The Court observes that Plaintiffs' counsel Eugene Iredale originally requested, and was granted, a 60 day extension from the date of the verdict, September 1, 2017 (which ended October 31, 2017). Dkt. No. 209 at 21. Due to the fact that judgment in this case was not issued until October 25, 2017, Plaintiffs' motion, filed on November 22, 2017, was timely filed pursuant to Rule 59.

1035 (9th Cir. 2003). One of these grounds is if the verdict is contrary to the weight of the evidence. *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007). Erroneous evidentiary rulings are also grounds for a new trial as long as the error "substantially prejudiced" a party. *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995).

In deciding a Rule 59(a) motion, "[t]he judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1973). However, a stringent standard applies when the motion is based on insufficiency of the evidence. *Venegas v. Wagner*, 831 F.2d 1514, 1519 (9th Cir. 1987). On this basis, a motion will be granted only if the verdict "is against the great weight of the evidence, or it is quite clear that the jury has reached a seriously erroneous result." *E.E.O.C. v. Pape Lift, Inc.*, 115 F.3d 676, 680 (9th Cir. 1997) (internal quotations omitted). "The district court cannot substitute its evaluations for those of the jurors." *Tortu v. Las Vegas Metro. Police Dept.*, 556 F.3d 1075, 1084 (9th Cir. 2009) (internal quotations omitted). The court "may not grant or deny a new trial merely because it would have arrived at a different verdict." *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999). The Ninth Circuit provides the following guidance on this somewhat imprecise standard:

> On the one hand, the trial judge does not sit to approve miscarriages of justice. His power to set aside the verdict is supported by clear precedent at common law and, far from being a denigration or a usurpation of jury trial, has long been regarded as an integral part of trial by jury as we know it. On the other hand, a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter. Probably all that the judge can do is to balance these conflicting

3

principles in the light of the facts of the particular case. If, having given full respect to the jury's findings the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial.

*Landes Const. Co., Inc.*, 833 F.2d at 1371-72 (footnotes omitted). The district court has discretion in ruling on a motion for a new trial. *SEC v. Todd*, 642 F.3d 1207, 1225 (9th Cir. 2011). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985). "Doubts about the correctness of the verdict are not sufficient grounds for a new trial: the trial court must have a firm conviction that the jury has made a mistake." *Landes Const. Co., Inc.*, 833 F.2d at 1372.

## II.     Background

On January 17, 2013, San Diego police officer Kristopher Walb shot and killed Angel Lopez. Vol. II at 419-420. Officer Walb was in his fifth month as a member of a Special Response Team in the San Diego Police Department's SWAT team.[3] Vol. II at 417.

Officer Walb's team arrived at the 5444 Reservoir apartment complex between 9:00 A.M. and 10:00 A.M. that morning. Vol. II at 441. Sergeant Ramsay, the SWAT React Team leader, testified that prior to arriving at the apartment complex, he briefed Officer Walb and the React Team outside of their van in the Eastern Division parking lot and inside of the van on the way to the apartment complex. Vol. V at 1089. Sergeant Ramsay told Walb and the officers that they were dealing with two wanted parolees, who were considered armed and dangerous. *Id*. The two parolees were a father and son and there was information regarding a third person who might be a kidnapping victim. *Id*. at 1090.

---

[3] Officer Walb first joined the SWAT team in October 2005 as a member of the Primary Response Team, where he had other non-SWAT duties as a police officer. Vol. III at 537.

4

Sergeant Ramsay provided Walb the suspects' names, photos, and information that Angel Lopez was a documented gang member with a prior weapons history and was always known to carry a handgun. *Id.*

Walb initially recalled that Sergeant Ramsay had informed him and his team that two wanted parolees were at the apartment complex and there was possibly a hostage situation inside of the apartment, that the individuals had cartel-connections, and that the individuals could be armed with AK-47s and possibly possessed a shotgun. Vol. II at 442; Vol. III at 558-59. Walb had also been told that Angel Lopez could be armed with a pistol. *Id.* at 510. Meanwhile, in an affidavit filed with a pretrial motion, Walb had declared that he had been told Lopez was in a cartel and a gang. *Id.* at 501. Walb testified that—in his mind—the threat potential of a cartel was much higher than that of a particular gang. Vol. III at 564.

After arriving, the police attempted to stop two individuals on the sidewalk outside the apartment complex. *Id.* at 583. Over the radio, Walb and his team heard "They are rabbitting. They are rabbitting towards the apartment," a term that means the suspects are running away from the police. *Id.* Following this announcement, Walb's team was assigned the mission to contain the apartment. *Id.* at 584. Officer Walb and his team exited their van and began to move towards the stairs with the goal to eventually enter the third floor where the Apartment 58 was located. *Id.* at 585. Walb believed that they would run into the suspect in the apartment complex. *Id.* at 588.

Officer Walb was going up a stairwell when a closed door at the top of the stairwell—that led to the third floor hallway—was opened by Angel Lopez. *Id.* at 513. Walb immediately identified Lopez because he matched a similar description—particularly with regard to tattoos—to pictures he had viewed in preparation for the mission. *Id.* at 514. Lopez saw Walb, turned and ran into the hallway, after closing the door behind him. *Id.* at 514, 516. Walb continued up the stairs and yelled "Get down. Get down. Get down." *Id.*

5

at 514. Walb opened the door and saw that Lopez was approximately 10 to 15 feet away from him. *Id.* Lopez continued to run, holding his hand in his left pocket, and continuously pulled and tugged at his pocket while he ran. *Id.* at 489. In the hallway, Walb yelled "Get down. Get down. Get down," and further yelled "[t]ake your hands out of your pockets. Get down. Get down." *Id.* at 515. Meanwhile, Officer Pickett was also yelling "Left hand. Watch his left hand. Left hand." Vol. V at 1008.

Lopez ran to an alcove in front of Apartment 58, where Walb believed he pulled on a door to try to get inside. *Id.* at 517. After a few seconds, Lopez came out of the alcove and walked down the hallway with his left hand in his pocket. *Id.* at 603. Lopez slowed down to a stop, began to bend his knees, and continued to tug at his pants with his left hand. *Id.* at 604. Walb testified that Lopez was turning towards him at the time he shot. Vol. II at 431; Vol. III at 604-05. Officer Walb testified that Lopez was not on his knees when he shot, but was standing with a slight bend in his knees. Vol. II at 424. Officer Walb shot Angel Lopez by "double tapping" the trigger on his MP5 Machine Pistol. Vol. II at 232, 430. Officer Walb aimed at center mass. *Id.* at 420. In total, six bullets were discharged. *Id.* at 427.

### III. Discussion

#### a. The Jury Verdict was not Against the Clear Weight of the Evidence

Defendants argue that the evidence presented at trial shows that Lopez defied Officer Walb's commands, refused to take his left hand out of his pocket, and made a distinct movement toward his right toward the direction of the officers. The totality of the circumstances, defendants argue, would have made any reasonable officer believe Lopez was about to use a weapon. Opp. at 4 (citing Vol. III at 607-08). Plaintiffs argue that the clear weight of the evidence shows that the defense case is inconsistent with the physical evidence. The heart of Plaintiffs' argument is that the wound paths are inconsistent with the Defendants' theory that Angel stood upright and pivoted to his right at the time of the

6

13-cv-2240-GPC-MDD

shots. Opp. at 5. Plaintiffs point to the upward angles of the three wound paths to argue that these wound paths could not have existed unless Walb was shooting from a position several feet below where Angel was. Opp. at 6.

Plaintiff argues that the case resolved itself into a single factual issue: the position of decedent when Walb shot and killed him. Dkt. No. 214-1 at 5. This assertion ignores the instructions of law provided to the jury.[4] *See* Dkt. No. 194 at 24-25 (Jury Instruction 9.25 re: Excessive Force). In evaluating the evidence presented at trial, the jury was required to consider the relevant factors which bear on the reasonableness of the use of deadly force. First, as to the nature of the crime and circumstances known to Walb at the time force was applied, Walb was provided information warranting a SWAT response to a potential hostage situation created by a drug cartel member. Given these facts, it would have been reasonable for Walb to conclude that Lopez posed an immediate threat to the hostage victim as well as the police officers who sought to save the hostage victim.[5]

---

[4] The jury instructions (adapted from the Ninth Circuit's Model Jury Instruction 9.25) stated:
  In determining whether the officer used excessive force in this case, consider all of the circumstances known to the officer on the scene, including:
  1. the nature of the crime or other circumstances known to the officer at the time force was applied;
  2. whether the decedent posed an immediate threat to the safety of the officer or to others;
  3. whether the decedent was actively resisting arrest or attempting to evade arrest by flight;
  4. the amount of time the officer had to determine the type and amount of force that reasonably appeared necessary, and any changing circumstances during that period;
  5. the type and amount of force used;
  6. the availability of alternative methods to take Angel Lopez into custody;
  7. the number of lives at risk (civilians, police officers) and the parties' relative culpability; i.e., which party created the dangerous situation, and which party is more innocent;
  8. whether it was practical for the officer to give warning of the imminent use of force, and whether such warning was given;
  9. whether a reasonable officer would have or should have accurately perceived a mistaken fact;
  10. whether there was probable cause for a reasonable officer to believe that the suspect had committed a crime involving the infliction or threatened infliction of serious physical harm.
Dkt. No. 194 at 24-25.
[5] The SRT team specialized in hostage rescue missions. Vol. III at 544.

Further, given Lopez's decision to flee, it was clear that Lopez was actively resisting arrest and attempting to evade arrest by flight. The evidence supported a conclusion that the dangerous condition was created by Lopez's attempt to evade the law enforcement officers and that Walb was more innocent than Lopez as to the events immediately preceding the use of deadly force.

At the time that deadly force was used, Lopez's flight created changing and fluid circumstances that did not provide Walb an appreciable amount of time to determine the type and amount of force that reasonably appeared necessary. In addition, it is undisputed that before deadly force was used, Walb repeatedly shouted out unheeded warnings for Lopez to get down and take his hands out of his pockets.

All of the above relevant factors provide a measure of support for Walb's use of deadly force. After considering these factors, the Court turns to the remaining salient factors: whether the decedent posed an immediate threat to the safety of the officer; whether a reasonable officer would have or should have accurately perceived a mistaken fact, and whether alternative methods to take Angel Lopez into custody were available. These factors require an examination of the explanation provided for the use of deadly force and the expert testimony attempting to reconstruct the moments immediately preceding the use of deadly force.

Plaintiff argues that the uncontested physical evidence established that Angel Lopez was going down to the ground when he was shot and was not spinning, turning or pivoting. Dkt. No. 214-1 at 5. The Court agrees and finds that the trajectory of the bullet wounds support the conclusion that Lopez was not standing erect or facing in the direction of Walb at the moment he was hit by the bullets. But the critical question is whether those conclusions foreclose the possibility that Lopez had turned towards Walb with his left hand in his pocket immediately before Walb shot Lopez—leading Walb to reasonably believe that Lopez was about to shoot him. Here, the evidence was in conflict.

8

Plaintiff offered expert testimony indicating that there was insufficient time for Lopez to turn towards and then away from Walb in the time necessary to create the trajectory angles for Lopez's bullet wounds. Vol. III at 682-699. Lance Martini testified that under principles of reaction-response, it was highly unlikely that "a person in the situation where they were being shot at could have turned one way and then, within less than a quarter of a second, moved exactly the opposite way so that they could have been struck in the fashion that we have here." Vol. III at 692.

Meanwhile, Defendants offered testimony from Officers Walb, Pickett, and Scott that Lopez was standing on his feet and turning to his right prior to Officer Walb firing his weapon. *See, e.g.*, Vol. III at 604-05; Vol. V at 1055, 1179. Moreover, Officer Pickett reiterated that he feared Lopez would fire when he testified that he would have fired at Lopez had Officer Walb not fired because he felt the suspect was turning to engage the officers with gunfire. *See* Vol. V at 1009.

Moreover, the officers' version of events was supported by Lucien Haag, the Defendants' Ballistics Expert. According to Haag,[6] the wound paths were consistent with the officers testimony because the first set of three bullets could have missed Lopez, allowing him time to change positions from his initial standing position in reaction to hearing the shots, and that it was the second round of bullets that actually hit him. *See, e.g.*, Vol. VII at 1488-89 ("Mr. Lopez realizes someone is about to shoot, just to duck. So he's missed. It goes over him. He is standing just fractions of a second before, when the decision to shoot was made, but in the time it takes to accomplish that act, he ducks down."). According to Haag, the wound paths were not consistent with someone who was kneeling down in a give-up position. *Id.* at 1496. Moreover, the rounds that missed were consistent with Officer Walb firing at center mass of someone at Lopez's height. *Id.* at

---

[6] The jury requested and was granted a readback of the testimony of Lucien Haag. *See* Vol. IX at 1742.

9

1531.

Other evidence further supports Defendants' theory of the case. Jennifer Pontrelli, a San Diego Police Department crime scene specialist, testified that Lopez was found next to bindles of narcotics and a syringe loaded with a brown liquid. Vol. II at 363-365. The jury could have inferred that these facts supported Defendants' theory that Lopez's hand was in his pocket by providing a reason for the hands to have been in the pocket, despite the order from Walb to remove his hands. Moreover, the presence of opiates and methamphetamine in Lopez's blood could explain Lopez's irrational behavior. *See, e.g.,* Vol. II at 337-38 (testimony of Dr. Jacquelyn Morhaime, County Medical Examiner, stating that Lopez had opiates and methamphetamine in his system, which could have affected his judgment).

The above facts support Walb's defense that Angel Lopez was standing, made distinct movements towards Walb and after the first three fired shots missed him, dove towards the ground so that the shots that hit Lopez arrived at an angle. The jury was presented with two permissible views of the evidence, one supporting the Plaintiff and the other supporting the defense. Giving full respect to the jury's findings and after close review of all of the evidence, the Court does not arrive at a definite and firm conviction that the jury choice was clearly erroneous. Ultimately, the jury's verdict was not against the clear weight of the evidence.[7]

### b. Common Knowledge of Waistband Defense

Plaintiffs argue that the Court erred by precluding cross-examination on the common

---

[7] In reviewing all of the evidence in this case, the Court is mindful that this case involves a tragedy which has upended the lives of the decedent's family and others. The magnitude of the tragedy is compounded by the fact that the informant's report of a hostage situation which led to the SWAT team deployment was blatantly false. But, this is the information that Walb possessed and reasonably relied upon. This case highlights the critical importance of performing necessary due diligence in the use of confidential informants.

10

knowledge among police of the "waistband defense."[8] Citing no case law or evidentiary principles, Plaintiffs argue that the court erred by precluding opportunity to cross examine regarding the waistband defense. The Court properly sustained these objections under Federal Rule of Evidence 402 and 403. *See*, *e.g.*, Vol. IV at 860; Vol. V at 1067. The Court allowed a brief inquiry on this topic with Defendants' expert Ronald McCarthy, who was not familiar with the term. Vol. VI at 1281. Further, the Court explicitly allowed testimony from expert Emmanuel Kapelsohn on this topic. *See id.* at 1328 ("You can ask him if he is familiar with the waistband defense and what his understanding of the waistband defense is."). The Court allowed limited testimony on this manner but properly limited Plaintiffs' counsel from bringing in anecdotal statements or cases for which the witness was not familiar. Accordingly, the Court properly limited testimony regarding the waistband defense under Federal Rules of Evidence 402 and 403 as irrelevant evidence that additionally had a danger of unfairly prejudicing a jury. Plaintiffs have not articulated how they were substantially harmed by any error. The Court concludes that Plaintiffs has neither shown that these rulings were erroneous, or were "substantially" prejudicial to Plaintiffs.

### c. Negative Character Evidence

Plaintiff argues that the jury's verdict was the result of antipathy towards decedent, sympathy for Walb,[9] and defense misconduct. Plaintiffs argue that negative character evidence of decedent's background was repeatedly introduced and essentially turned the trial into a "morality play in which officer Walb was good, and decedent Angel was evil." Mot. at 16. Plaintiffs take particular issue with Defendants' references to Lopez's gang

---

[8] The "waistband defense" is when a police officer claims that he saw an unarmed decedent reach for his waistband for a non-existent weapon.

[9] Plaintiff's point to Walb's "highly emotional and tearful testimony." Mot. at 11. The Court observes that this is not a basis to overturn a jury verdict. Defendants correctly point out that Plaintiffs have not presented any proof that the jury's verdict was swayed by this emotional testimony. Opp. at 17.

11

membership.[10]

"Evidence of gang membership can be inflammatory, with the danger being that it leads the jury to 'attach a propensity for committing crimes to [persons] who are affiliated with gangs or that a jury's negative feelings toward gangs will influence its verdict.'" *United States v. Harris*, 587 F.3d 861, 867 (7th Cir. 2009) (*quoting United States v. Montgomery,* 390 F.3d 1013, 1018 (7th Cir. 2004)). "Gangs generally arouse negative connotations and often invoke images of criminal activity and deviant behavior." *United States v. Irvin,* 87 F.3d 860, 865 (7th Cir. 1996). "Evidence of gang membership can taint a [party] in the eyes of a jury." *United States v. Sargent,* 98 F.3d 325, 328 (7th Cir. 1996). The assumption that all gang members act aggressively gives rise to the danger of unfair prejudice. *See Lee v. Andersen,* 616 F.3d 803, 810 (8th Cir. 2010).

The Court, recognizing the inflammatory nature of this evidence, granted Plaintiffs' motion in limine to bifurcate the trial into a liability and damages stage over the objection of the defense so that gang evidence would not be presented on questions regarding damages. *See* Dkt. No. 128. The Court limited the consideration of such testimony by Walb to his state of mind in the moments leading up to the use of deadly force. Vol. III at 468, 535-36. Further, the jury was instructed that the information the officers learned at their briefing about Angel Lopez and the other suspect—which included *inter alia* his gang/cartel membership—was not offered for the truth of the matter asserted. *See* Vol. V

---

[10] On Reply, Plaintiffs argue that Defendants snuck in multiple references to Lopez's prior gun-related convictions and other negative character information. Reply at 3-5. The Court concludes that any reference to Lopez's weapons history was relevant and not unduly prejudicial given that Walb explicitly testified that he had knowledge of Lopez's gun-related convictions at the time of the shooting. Vol. III at 561. *See also* Vol. V at 1089 (Sergeant Ramsay's testimony that he informed Walb and the other officers about Lopez's "prior weapons history). The Court repeatedly stated to counsel that it was "fair game" to ask what Walb had learned about the suspect at the time of the shooting. *See* Vol. V at 963. Moreover, Plaintiffs' counsel did not make a timely objection to the introduction of any of the complained-of evidence on relevance or Rule 403 grounds. *See* Vol. V at 994 (no objection), 1089-1090 (no objection), 1132 (cumulative objection only), 1123 (cumulative objection only).

12

at 993; Vol. IV at 918. In addition, the Court also limited a line of questioning related to gang tattoos to the narrow topic of how knowledge of gang activities affected the witness at the time of the incident. Vol. III at 535-36. *See also United States v. Takahashi*, 205 F.3d 1161, 1165 (9th Cir. 2000) (holding district court did not abuse discretion in admitting evidence of gang membership where court recognized the need to prevent undue prejudice and gave a limiting instruction).

Next, the Court finds that Plaintiff failed to timely object under Rule 403 to Officer Pickett's testimony regarding gang evidence. Specifically, hearsay and relevancy objections were made to two questions which produced Officer Pickett's testimony referencing knowledge of Lopez's gang affiliation. Vol. V at 993. While Plaintiff later filed a motion for mistrial based upon references to Plaintiff's gang membership, he failed to make a timely specific objection under Rule 403 or request a timely curative instruction. *See* Vol. V at 994.

Moreover, Defendants' reference to Lopez's gang membership is permissible because it constituted part of the knowledge that Officer Walb had in his state of mind at the time of the shooting. The evidence helped establish Walb's state of mind and the overall situation of danger in the hallway, all of which was relevant to the jury's evaluation of the totality of the circumstances. *See Rodriguez v. Jacquez*, No. CV 09-1550-MWF JEM, 2012 WL 4829225, at *9 (C.D. Cal. Aug. 29, 2012), *report and recommendation adopted*, No. CV 09-1550-MWF JEM, 2012 WL 4511410 (C.D. Cal. Oct. 2, 2012) (allowing testimony regarding gang membership if this knowledge was part of petitioner's state of mind); *Kongkham v. Yates*, No. CIV S070088LKKCMKP, 2010 WL 2292279, at *1 (E.D. Cal. June 4, 2010) (same); *Bravo v. City of Santa Maria*, 2013 WL 12224037, at *4 n.8 (C.D. Cal. July 1, 2013) (same).

Further, given the impeachment of Walb as to knowing Lopez's gang connection at the time of the shooting, the testimony from Ramsay and Pickett supported Walb's

13

testimony that Walb, along with the other officers, were informed of the gang evidence at the briefing before the mission. Finally, given the nature of the evidence, the Court instructed the jury that the evidence provided to the officers in the briefing was not offered for the truth of the matter asserted. *See* Vol. V at 993.

This fact pattern is distinguishable from *Estate of Diaz v. City of Anaheim*, 840 F.3d 592, 598 (9th Cir. 2016). There, the Court found that the decedent's gang membership was not relevant to the question of liability because the officer *did not know* the decedent Diaz was a gang member. *See id.* ("the district court held that evidence of Diaz's gang affiliation was relevant only to damages, because Officer Bennallack did not know he was a gang member."). Here, in contrast, Officer Walb and the other officers were explicitly informed that Plaintiff was in a gang.[11] Officer Walb testified that he was told that Lopez was possibly a cartel member, and that he understood a Cartel to be a gang. *See* Vol. II at 448 ("A cartel is a gang, sir"); Vol. III at 500 ("There was mention of the cartel. I don't remember a particular gang set that was mentioned, but there was the mention of a cartel."); *id.* at 503 ("'cartel' is a gang"); *id.* at 561 (describing how cartels use gang members for enforcement actions). Moreover, the Court observes that *Plaintiffs'* counsel repeatedly elicited testimony—in an attempt to impeach Walb—that would have made the jury aware of Lopez's gang membership. *See, e.g.*, Vol. III at 37 ("[D]id you swear that you had been told that Angel Lopez was possibly a member of a cartel and a gang known as Sydro [?]").

Finally, Plaintiffs' counsel had the opportunity to impeach Officer Walb's credibility on whether Walb knew that Lopez was in a gang prior to the shooting. In October 2014, Officer Walb executed an affidavit in this case stating that prior to the filing of the shots he was aware that "Lopez belonged to a criminal gang which I recalled was the cartel, and Sydro [the gang.]" *Id.* at 502. Plaintiffs' played testimony of an interview Walb provided

---

[11] Testimony by Walb related to his knowledge of Lopez's gang-style tattoos was also played by counsel to the jury. *See* Vol. VI at 1220.

14

five hours after the shooting where he mentioned only a cartel and did not mention knowledge of any gangs. Vol. II at 448, Vol. III at 500. At trial, Walb asserted that he did not "exactly remember" when he was told Lopez was a member of Sydro and "honestly [did] not remember" if he was told this information prior to the actual incident or after the incident. Vol. III at 503. When asked by Mr. Iredale if it was "true that there was no mention of a gang that was given to you in connection with the parolees?" Walb responded that "[y]ou are confusing me with what you are asking me because a cartel is a gang, and we had that information going in there. If you are referring to my Homicide interview or deposition, I may not have referred to it as a gang at that time." Vol. II at 449. Plaintiffs' counsel was given ample opportunity to impeach Walb's credibility. The jury heard this testimony and was able to assess the credibility of Walb's assertion that he believed cartels to be a gang. Consequently, evidence that Lopez had been in a gang was properly admissible as part of the knowledge Walb had at the time of the shooting.

Further, even assuming *arguendo* this evidence was improperly admitted, the Court concludes that its inclusion did not lead to substantial prejudice. Throughout the course of the trial, the jury was made aware of substantial and admissible negative character evidence—including cartel membership, drug use, criminal history, and gang-style tattoos—about Mr. Lopez. *See* Vol. III at 502, 560; Vol. I at 170. In addition, as pointed out by Walb, information that Lopez was in a cartel was information which indicated a threat potential that was far greater than that created by a local gang. Vol. III at 564. *Cf.*, *United States v. Verduzco*, 373 F.3d 1022, 1034 (9th Cir. 2004) (Southern California juries are "well aware of the image that violence and corruption is part and parcel of the illegal Mexican drug-trafficking business.")

Given that the jury was able to take into account Walb's knowledge of this evidence, the Court cannot conclude that the inclusion of references to Lopez's gang membership—given the weight of the other evidence—substantially prejudiced the outcome of the trial.

### d. Impugning the Character of Plaintiffs' Counsel

To warrant a new trial on grounds of attorney misconduct, the flavor of the misconduct must "sufficiently permeate an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict." *Doe ex. rel Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1270 (9th Cir. 2000). Plaintiff argues that Defense Counsel "impugned the character of Plaintiffs' Counsel" by: (1) making a speaking objection and (2) stating to the jury that a test dummy was not "prone on the ground" despite an agreement between counsel to display the test dummy only vertically or horizontally.

Ms. Stephan, defense counsel, made a speaking objection that was explicitly not permitted[12] during Plaintiffs' closing argument by stating "Objection, Your Honor. The dummy's not in the same condition as it was. There was another dowel added to it. And it lacks foundation." Vol. VII at 19-21. Ms. Stephan's statement was factually incorrect because no dowel had actually been added to the dummy. Plaintiffs' counsel argues that this statement was a deliberate attempt to accuse Mr. Iredale, plaintiffs' counsel, of fraud and tampering with the evidence. Defendant responds that she made her statement with good faith, and with no intent to deliver erroneous information. Given that Ms. Stephan's remark was brief, limited to a single remark, and because the Court stated that arguments of lawyers are not evidence, Defense counsel's improper speaking objection and misstatement of the facts was not substantially prejudicial to plaintiffs. *See Parson v. Santoro*, 2017 WL 2273193, at *5-6 (C.D. Cal. Apr. 17, 2107).

Second, Ms. Stephan suggested in her closing argument that the dummy had been misleadingly shown to the jury "prone on the ground" despite the testimony of Lucien Haag who stated that Lopez was not "prone on the ground." Plaintiff argues that defense counsel

---

[12] *See* Civil Pretrial and Trial Procedures of the Honorable Gonzalo P. Curiel at 6 ("Speaking objections are not permitted, unless the Court requests further information from counsel.").

16

accused plaintiffs of "trying to trick the jury by displaying the mannequin in a misleading way" in violation of the spirit of an agreement between counsel to only display the mannequin vertically or horizontally. Mot. at 14-15. Mr. Iredale objected to this argument at trial and the Court overruled the objection. The Court concludes that this statement did not lead to substantial prejudice, particularly in light of the fact that the Court issued a limiting instruction stating that closing arguments are merely an opportunity for the sides to present the facts that they believe the evidence supports. *See* Vol. VII at 1620 ("As I have indicated, closing arguments are just the opportunity for both sides to present the facts as they believe the evidence supports . . . Ultimately if you recall the facts different . . . then your memory will govern.").

### e. Vouching

Plaintiff argues that Defense Counsel argued her personal opinions and belief during closing argument. *See, e.g.*, Vol. VII at 1641 ("this is part of what *I think* you should consider"); *id.* at 1641-42 ("The idea that you can wait until you see the weapon, I believe that every single . . ."); *id.* at 1662 ("but I believe that these facts alone and that testimony alone would render the testimony not reliable, or Mr. Clark."). The Court, *sua sponte*, repeatedly advised Ms. Stephan to refrain from vouching. *See id.* at 1641 ("Ms. Stephan, please refrain from using the expression 'I think.' Avoid vouching."); *id.* at 1642 ("[P]lease refrain from using 'I believe' or 'I think.'"); *id.* at 1662 (issuing same ruling).

Plaintiffs have not shown that Ms. Stephan's remarks warrant the extraordinary remedy of a new trial. Any vouching took place in the context of closing argument. *See Kehr v. Smith Harris, Upham & Co.*, 736 F.2d 1283, 1286 (9th Cir. 1984) (affirming denial of mistrial where "offending remarks occurred principally during opening statement and closing argument"). Moreover, the Court instructed the jury multiple times that arguments of counsel are not evidence. *See* Vol. VII at 1571. Further, Ms. Stephan's comments were made with the purpose to explain her belief as to "what he testified to" as opposed to her

17

"belief of what the evidence supports." *See* Vol. VII at 1659.

Accordingly, the Court concludes that given the limited nature of Ms. Stephan's comments and that these comments were addressed by the Court's instructions, that any vouching did not substantially prejudice Plaintiffs' to the level required to warrant the extraordinary remedy of a new trial.

## CONCLUSION AND ORDER

Based on the reasoning above, the Court will **DENY** Plaintiffs' Motion for a New Trial.

**IT IS SO ORDERED**.

Dated: January 30, 2018

Hon. Gonzalo P. Curiel
United States District Judge